## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A COMPLAINT AND ARREST WARRANT

I, Barry Hyland, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent of the Department of Labor – Office of Inspector General. The information contained in the complaint is based upon my personal knowledge, as well as information obtained from other sources, including: (a) statements made or reported by various witnesses with knowledge of relevant facts; (b) my review of publicly available information; and (c) my review of evidence, including business records, bank records, and other documents and records.  Because this complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation.  Where the contents of documents and the actions and statements of others are reported herein, they are reported in substance and in part, except where otherwise indicated.  Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

2.      Based on the facts set forth in this affidavit, there is probable cause to believe that TRAVIUS HOLLOWAY has committed violations of Title 18, United States Code, Section 1343 (Wire Fraud).

### PROBABLE CAUSE

#### *Relevant Individuals and Entities*

3.      Defendant TRAVIUS HOLLOWAY was a resident of Richmond Heights, Ohio, in the Northern District of Ohio.

4.      Bank 1 was a federally insured financial institution headquartered in North Carolina.  Bank 1 had branch offices and automated teller machines ("ATMs") located in the Northern District of Ohio. Bank 1's servers were located in Texas and California.

5.      Bank 2 was a federally insured financial institution headquartered in Minneapolis, Minnesota.  Bank 2 had branch offices and automated teller machines ("ATMs") located in the Northern District of Ohio.  Bank 2's servers were located in the States of Minnesota and Kansas.

6.      Bank 3 was a federally insured financial institution headquartered in Birmingham, Alabama.  Bank 3's server was located in Alabama.

### Background Regarding Unemployment Insurance

7.      The Social Security Act of 1935 initiated the federal and state unemployment insurance ("UI") system.  The UI system provided temporary financial assistance to eligible lawful workers who were unemployed through no fault of their own.  The purpose of the UI system was twofold: to lessen the effects of unemployment through direct cash payments to laid-off workers; and to ensure that life necessities were met weekly while the worker sought employment.

8.      State unemployment systems and benefits were joint federal and state enterprises administered by the State Workforce Agency ("SWA") of a given state and largely financed by taxes on private employers located in the state.  SWAs administered UI programs in accordance with federal laws and regulations.  Each state set its own additional requirements for eligibility, benefit amounts, and length of time benefits were paid.  Generally, UI weekly benefit amounts were based on a percentage of a lawful worker's earnings over a base period.  When state unemployment benefits were exhausted, the U.S. Department of Labor ("DOL") could supplement them with federal funds.

9.      Because of the COVID-19 pandemic, the SWAs' ability to provide UI benefits were expanded.  On or about March 13, 2020, the President declared the ongoing COVID-19 pandemic of sufficient severity and magnitude to warrant an emergency declaration for all states, tribes, territories, and the District of Columbia, pursuant to section 501(b) of the Robert T.

Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §§ 5121-5207.  On or about March 27, 2020, the President signed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act into law.  The CARES Act expanded SWAs' ability to provide UI for many workers impacted by COVID-19, including for workers who were not ordinarily eligible for UI benefits.  The CARES Act provided for three new temporary UI programs: (1) Pandemic Unemployment Assistance ("PUA"); (2) Federal Pandemic Unemployment Compensation ("FPUC"); and (3) Pandemic Emergency Unemployment Compensation ("PEUC"), (collectively, "Pandemic UI").

10.     PUA provided for up to 39 weeks of benefits to individuals who were self-employed, seeking part-time employment, or otherwise would not qualify for regular or extended benefits under state or federal law or PEUC under section 2107 of the CARES Act.  Coverage included individuals who exhausted all rights to regular UI benefits or extended benefits under state or federal law or PEUC.  Under the PUA provisions of the CARES Act, a person who was a business owner, self-employed worker, independent contractor, or gig worker qualified for PUA benefits administered by the State SWAs if the individual previously performed such work in a State and was unemployed, partially unemployed, unable to work, or unavailable to work due to a COVID-19-related reason.  The eligible timeframe to receive PUA was for weeks of unemployment beginning on or after January 27, 2020, through approximately September 2021.

11.     PEUC provided for up to 13 weeks of benefits to individuals who had exhausted regular UI under state or federal law; had no rights to regular UI under any other state or federal law; were not receiving UI under the UI laws of Canada; and were able to work, available for work, and actively seeking work.  The State SWAs had to offer flexibility in meeting the actively seeking work requirement if individuals were unable to search for work because of COVID-19,

for reasons including illness, quarantine, or movement restriction. The eligible timeframe to receive PEUC was from April 5, 2020 (or the next date after the respective state had an established agreement with the federal government), through July 31, 2020.

12.     FPUC provided individuals who were collecting regular UI, PEUC, and PUA with an additional $600 per week from April 5, 2020 (or the next date after the respective state had an established agreement with the federal government), through July 31, 2020.

13.     Regardless of which of the three programs described above (PUA, PEUC, or FPUC) was involved, funds were distributed to program participants by the SWA, after the SWA received the funds from the United States Department of the Treasury. While there were different paths that payments could take from the Treasury Department to a given SWA, all such payments were routed through multiple states and across multiple state lines in interstate commerce.

14.     The California SWA was the Employment Development Department ("EDD"). The California SWA used Bank 1 to administer Pandemic UI benefits. If the California SWA approved the claimant's application, Bank 1 mailed a debit card to the claimant which was subsequently loaded with benefits on the claimant's card at certain intervals. The claimant could change the mailing address with Bank 1 after the claim was approved. Bank 1 servers were located in Texas and California. The California SWA servers were located in California.

15.     The Ohio SWA was the Office of Unemployment Insurance Operations, which was part of the Ohio Department of Job and Family Services ("ODJFS"). The Ohio SWA used Bank 2 to administer Pandemic UI benefits. If the Ohio SWA approved the claimant's application, Bank 2 mailed a debit card to the claimant which was subsequently loaded with benefits on the claimant's card at certain intervals. The Ohio SWA also allowed a claimant to

receive UI benefits through direct deposit into a bank account of the claimant's designation, the payments which were sent via automated clearing house (ACH) deposit from Bank 2. The Ohio SWA's servers for PUA claims were located in Virginia.

16.     The Alabama SWA was the Alabama Department of Workforce ("ADW"). The ADW used Bank 3 to administer Pandemic UI benefits. The ADW allowed claimants to receive UI benefits through direct deposit into a bank account of the claimant's designation, the payments which were sent via ACH deposit from Bank 3. The ADW's servers for PUA were located in Alabama.

17.     To obtain California, Ohio, or Alabama Pandemic UI, an individual could apply online through the California SWA website, the servers for which were located in the State of California, through the Ohio SWA website, the servers for which were located in Virgina, or through the Alabama SWA website, the servers for which were located in Alabama. Claimants answered various questions to establish their eligibility. Claimants were required to provide personal identifying information, which included their name, mailing address, gender, email, phone number, social security number, and date of birth (collectively, "personal identification information"). Moreover, claimants had to identify a qualifying occupational status and COVID-19-related reason for being unemployed. Claimants could also submit several documents as evidence of their income.

### *Background Regarding the Paycheck Protection Program*

18.     The Paycheck Protection Program ("PPP") was a COVID-19 pandemic relief program administered by the U.S. Small Business Administration ("SBA") that provided forgivable loans to small businesses for job retention and certain other expenses. The PPP permitted participating third-party lenders to approve and disburse SBA-backed PPP loans to

cover payroll, fixed debts, utilities, rent/mortgage, accounts payable and other bills incurred by qualifying businesses during, and resulting from, the COVID-19 pandemic. PPP loans were fully guaranteed by the SBA.

19.     To obtain a PPP loan, a qualifying business had to submit a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain the PPP loan, including that the business was in operation and either had employees for whom it paid salaries and payroll taxes or paid independent contractors, and was required to provide, among other things, its average monthly payroll expenses and number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. A business applying for a PPP loan was required to provide documentation showing its payroll expenses, such as filed federal income tax documents.

20.     Sole proprietorship applicants (including a self-employed individual, also known as a "Schedule C business") could use the proprietorship's annual gross revenue as the "payroll" figure and were not required to provide documentation in the same manner as other applicants. Some versions of the application form specifically directed applicants to enter the gross revenue from a particular federal income tax form.

21.     PPP loan applications were electronically submitted or caused to be submitted by the borrower and received through SBA servers located outside the State of Ohio, in Virginia or Oregon. Once approved, the business received the PPP loan proceeds via an electronic funds transfer from the third-party lender to a financial account under the control of the business.

22.     Lender 1 was a third-party participating lender in the PPP. Lender 1 received PPP loan applications through Processor 1, which received applications through its website and transmitted applications to Lender 1 and other participating PPP lenders. PPP loan applications to Lender 1 through Processor 1 were transmitted across state lines because Processor 1's servers were in Oregon, while Lender 1's servers were located in Ohio.

### The Scheme to Defraud

23.     The objects and purposes of the conspiracy and scheme included, but were not limited to, the following: for Defendant TRAVIUS HOLLOWAY and others to unlawfully enrich themselves by, among other things: (a) from in or around May 2020 through in or around October 2021, inducing DOL, EDD, ODJFS, ADW, and other state SWAs, to issue Pandemic UI benefits to HOLLOWAY and his designees, to which he was not entitled, based on materially false statements and omissions and the unlawful use of other persons' identities; and (b) from in or around May 2021 through in or around June 2022, inducing the SBA and a participating PPP lender to approve a PPP loan based on materially false statements and omissions and to distribute the PPP funds to accounts controlled by HOLLOWAY and his designees.

### Manner and Means of the Scheme

24.     The manner and means by which Defendant carried out the scheme included, but were not limited to, the following:

a.     Defendant and others knowingly made and caused to be made materially false statements and omissions on Pandemic UI Benefits applications to EDD, ODJFS, ADW, and other state SWAs to appear to be eligible to receive Pandemic UI benefits, including false statements regarding employment history, residency and other information, and misrepresentations about who was receiving the benefits sought.

b.    These materially false statements and omissions on the Pandemic UI benefits applications induced DOL, EDD, ODJFS, ADW, and other SWAs to issue Pandemic UI benefits to which HOLLOWAY and others were not entitled.

c.    Upon receiving the fraudulently obtained Bank 1-issued debit cards from the EDD, HOLLOWAY made cash withdrawals via bank ATMs and at multiple locations in the Northern District of Ohio using the EDD debit cards, thereby obtaining Pandemic UI benefits he was not qualified or authorized to receive.

d.    Upon receiving the fraudulently obtained Bank 1-issued debit cards from the EDD, HOLLOWAY caused the transfers of Pandemic UI benefits from Bank 1-issued debit cards to his own financial accounts and digital wallets, including Cash App accounts[1].

e.    HOLLOWAY, through interstate wire communications, submitted and caused to be submitted, a PPP loan application to a participating PPP lender in HOLLOWAY's name, which contained materially false statements and omissions regarding HOLLOWAY's business.

f.    As a result of the fraudulent PPP loan application, HOLLOWAY caused a participating PPP lender to issue to an account controlled by HOLLOWAY PPP loan funds.

### Acts in Furtherance of the Scheme

25.    The acts caused by Defendant in furtherance of the scheme, in the Northern District of Ohio, Eastern Division, and elsewhere, included, but were not limited to, the following:

---

1 Block, Inc. is a financial service company headquartered in Oakland, California.  Block, Inc. includes Cash App, a financial services platform which allows the customer to send and receive money into a digital wallet.  Block, Inc's production system environment components are located in third-party data centers in San Jose, California, Ashburn, Virginia, and Tokyo, Japan.

*Victim 1 California Application*

26.     On or about August 24, 2020, an electronic application for Pandemic UI benefits in the name of Victim 1 was submitted from an address in the Northern District of Ohio to EDD and listed a California mailing and residential address.  The information on the application concerning Victim 1's residence, employment, and income was false, along with misrepresentations about who was receiving the benefits sought.

27.     Victim 1 did not submit the application and did not reside at the residence listed on the application.

28.     On or about August 26, 2020, Bank 1 sent, via regular U.S. mail, to an address in California, a Bank 1-issued debit card in the name of Victim 1, which was subsequently loaded with Pandemic UI benefits in the approximate amount of $22,800.

29.     On or about September 4, 2020, the Bank 1-issued debit card in the name of Victim 1 was linked to a Cash App account in Holloway's name and a deposit to Holloway's Cash App account was attempted but failed.

30.     On or about September 14, 2020, Defendant withdrew $1,000 from a Bank 1 ATM located in Atlanta, Georgia, using the Bank 1-issued debit card in the name of Victim 1, thereby obtaining California Pandemic UI benefits for which he was not eligible and to which he was not entitled, knowing the benefits were obtained under false pretenses.

31.     On or about September 14, 2020, Defendant was listed as a passenger on a flight from Atlanta, Georgia to Cleveland, Ohio, paid for with the Bank 1-issued debit card in the name of Victim 1.

32.     Victim 1 was interviewed by law enforcement and stated they never filed PUA in any state, never gave anyone permission to file PUA on their behalf or to use a debit card in their name, and never lived or worked in California.

*Victim 2 California Application*

33.     On or about August 28, 2020, an electronic application for Pandemic UI benefits in the name of Victim 2 was submitted to EDD and listed a California mailing and residential address. The information on the application concerning Victim 2's residence, employment, and income was false, along with misrepresentations about who was receiving the benefits sought.

34.     Victim 2 did not submit the application and did not reside at the residence listed on the application.

35.     On or about August 30, 2020, Bank 1 sent, via regular U.S. mail, to an address in California, a Bank 1-issued debit card in the name of Victim 2, which was subsequently loaded with Pandemic UI benefits in the approximate amount of $23,700.

36.     From on or about September 11, 2020, to on or about September 21, 2020, Defendant withdrew at least $4,000 in PUA funds from Bank 1 ATMs located in Mayfield Heights, Ohio and Atlanta, Georgia, using the Bank 1-issued debit card in the name of Victim 2, thereby obtaining California Pandemic UI benefits for which he was not eligible and to which he was not entitled, knowing the benefits were obtained under false pretenses.

37.     On or about September 13, 2020, the Bank 1-issued debit card in the name of Victim 2 was linked to a Cash App account in Holloway's name.

38.     On or about September 17, 2020, Defendant was listed as a passenger on a flight from Cleveland, Ohio to Phoenix, Arizona, paid for with the Bank 1-issued debit card in the name of Victim 2.

39. Victim 2 was interviewed by law enforcement and stated they never filed PUA in any state, never gave anyone permission to file PUA on their behalf or to use a debit card in their name, and never lived or worked in California.

*HOLLOWAY Ohio Application*

40. On or about May 30, 2020, an electronic application for Pandemic UI benefits in HOLLOWAY's name was submitted from an address in the Northern District of Ohio to ODJFS and listed HOLLOWAY's address in Richmond Heights, Ohio. The information on the application stated HOLLOWAY resided in Ohio and was self-employed as a barber, hairdresser, hairstylists, and cosmetologists, and that he last worked as an independent contractor on March 16, 2020.

41. Between on or about June 1, 2020, through on or about July 13, 2020, approximately $12,213 in Ohio PUA benefits were deposited into HOLLOWAY's Cash App account.

42. On or about July 20, 2020, a weekly continued claim form was electronically submitted to ODJFS attesting that during the reporting period of July 5, 2020, through July 11, 2020, HOLLOWAY was still totally or partially unemployed because of the COVID-19 Pandemic.

43. According to the ODJFS, there were no Ohio wages reported for HOLLOWAY from at least 2019 through 2024. According to the IRS, for tax years 2019 through 2021, there were no Forms 1040 individual income tax returns filed for HOLLOWAY's social security number. According to a State of Ohio license search, there were no Ohio cosmetology or barber licenses in HOLLOWAY's name.

44.     Between on or about May 30, 2020, and on or about March 3, 2021, there were six PUA claims in six different states filed in HOLLOWAY's name.  In several of these applications, HOLLOWAY asserted he was unemployed due to the COVID-19 Pandemic and he had not obtained unemployment from any other state.

45.     In contrast to the assertions of unemployment, on or about May 12, 2021, there was a PPP loan in HOLLOWAY's name, and the application stated HOLLOWAY's business was established on March 22, 2010, was in operation on February 15, 2020, and was not permanently closed, and was still in operation during the COVID-19 pandemic.

*HOLLOWAY California Application*

46.     On or about July 7, 2020, an electronic application for Pandemic UI benefits in HOLLOWAY's name was submitted from an address in the Northern District of Ohio to EDD and listed the mailing address as HOLLOWAY's address in Richmond Heights, Ohio, and listed a California residential address.  The information on the application stated HOLLOWAY resided in California and was self-employed as a barber with an annual income of $45,000.

47.     On or about July 8, 2020, Bank 1 sent, via regular U.S. mail, to HOLLOWAY's address in Richmond Heights, Ohio, a Bank 1-issued debit card in HOLLOWAY's name, which was subsequently loaded with Pandemic UI benefits in the approximate amount of $17,493.

48.     On or about July 14, 2020, the Bank 1-issued debit card in HOLLOWAY's name was linked to a Cash App account in HOLLOWAY's name.

49.     Between on or about July 14, 2020, and on or about July 19, 2020, approximately $12,716 was sent from the Cash App account in HOLLOWAY's name to multiple individuals, including to a co-conspirator.  The source of the funds was the Bank 1-issued debit card in HOLLOWAY's name.  Thus, HOLLOWAY obtained California Pandemic UI benefits for which

he was not eligible and to which he was not entitled, knowing the benefits were obtained under false pretenses.

50.    According to a State of California license search, there were no California cosmetology or barber licenses in HOLLOWAY's name.

*HOLLOWAY Alabama Application*

51.    On or about March 3, 2021, an electronic application for Pandemic UI benefits in HOLLOWAY's name was submitted from HOLLOWAY's address in the Northern District of Ohio to the ADW and listed HOLLOWAY's mailing and residential address in Birmingham, Alabama.  The application stated that HOLLOWAY worked for a lumber company in Alabama between October 2018 through March 5, 2020, and was no longer working due to lack of work. The information on the application stated HOLLOWAY did not file for or receive unemployment benefits from another state within the last 12 months.  The information on the application also stated HOLLOWAY did not work in another state other than Alabama, with an employer that is not Military or Federal Government, in the last 18 months.  The information on the application stated HOLLOWAY did not work for himself, did not own a business, and was not a corporate officer for a business.

52.    Between on or about March 18, 2021, through on or about April 7, 2021, approximately $1,652 in Alabama PUA benefits were deposited by Bank 3 into a bank account in HOLLOWAY's name.

*HOLLOWAY PPP Application*

53.    On or about May 12, 2021, a PPP application was submitted from HOLLOWAY's address in the Northern District of Ohio to the SBA in the name of HOLLOWAY, doing business as (DBA) Trav McFilms with employer ID number (EIN) ending

in 4817.  The PPP application requested a loan amount of $121,865, and stated that the borrower was in operation on February 15, 2020, has not permanently closed, and was either an eligible self-employed individual, independent contractor, or sole proprietorship with no employees, or had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC.  The application stated that HOLLOWAY's business, Trav McFilms was established on March 22, 2010.  The application further stated that the 2019 gross income of the business was $636,121 and the business had five employees.

54.    HOLLOWAY's PPP application included a 2019 IRS Form 940 (Employer's Annual Federal Unemployment Tax Return) for Trav McFilms with EIN ending in 4817.  The Form 940 stated that state unemployment tax was paid to Ohio, and total payments to employees was $364,800.  The form had HOLLOWAY's signature and was dated January 13, 2020.

55.    The ODJFS did not have an employer record, did not have any wages reported, and did not have any records of unemployment taxes paid for a business with EIN ending in 4817.  The ODJFS also did not have a record of any Ohio wages reported for HOLLOWAY's social security number prior to 2025.

56.    HOLLOWAY's PPP application included a first quarter 2020 IRS Form 941 (Employer's Quarterly Federal Tax Return) that stated the business paid wages of $91,200 to five employees, withheld Federal income tax from wages of $14,801.50, and had a balance due of $28,755.10 in total taxes. The form had HOLLOWAY's signature and was dated April 6, 2020.

57.    HOLLOWAY's PPP application included a 2019 IRS Form Schedule C, Profit or Loss From Business that listed $636,121 in gross receipts and $495,291 in total expenses.

58.     According to the IRS, for tax years 2019 through 2021 there were no Forms 941, Forms 940, and no corporate returns filed for EIN ending in 4817.  Furthermore, for tax years 2019 through 2021, there were no Forms 1040 individual income tax returns filed for HOLLOWAY's social security number.

59.     HOLLOWAY's PPP application included a State of Ohio Articles of Organization document for Tra-V MCFILMS LLC with an effective date of March 31, 2010, document number ending in 5012.  According to the Ohio Secretary of State website, this same document number ending in 5012 has an effective date of March 31, 2021.  The PPP application also included an IRS letter addressed to Travius Holloway/Tra-V Mcfilms, with a purported date of March 22, 2010, and stated the purpose of the letter "will serve as proof of EIN assignment verification."

60.     On or about June 1, 2022, a PPP Loan Forgiveness Application for HOLLOWAY's business was submitted that requested loan forgiveness amount of $121,865 and stated $73,119 was spent on payroll costs.

61.     On or about June 8, 2022, the SBA remitted to Lender 1 the forgiveness amount of $121,865 in principal and $1,268.73 in interest for the PPP loan in HOLLOWAY's name.

*(Remainder of page intentionally left blank)*

## **CONCLUSION**

62.     Based on the foregoing, I respectfully submit that there is probable cause to believe that TRAVIUS HOLLOWAY committed wire fraud from on or about May 2020 through in or around June 2022, in the Northern District of Ohio, and elsewhere.

Barry Hyland
Special Agent
US DOL-OIG

This affidavit was sworn to by the affiant by telephone after a PDF was transmitted by email, per Fed. R. Crim P. 4.1, 41(d)(3) on this _____ day of December 2025. at 9:50 a.m.



JENNIFER DOWDELL ARMSTRONG
U.S. MAGISTRATE JUDGE